FILED
2011 Dec-07 PM 04:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

MONTAGUE MINNIFIELD, )
)
Plaintiff, )
)
v. ) CASE NO. 2:09-CV-1194-PWG
)
CITY OF BIRMINGHAM, )
CAPTAIN BEN KING, individually and )
in his official capacity as Captain, )
)
Defendant. )

**MEMORANDUM OPINION**

Before the court is defendants' motion for summary judgment (doc. 17), brief and evidentiary submissions (doc. 18), plaintiff's response (doc. 22), his evidentiary submissions (doc. 23), and defendants' reply (doc. 24).[1] Having considered the foregoing and all pleadings filed to date, the court finds as follows:

**Factual Background**

Plaintiff Montague Minnifield ("Minnifield") is an African-American male police officer employed by the City of Birmingham ("City"). Minnifield Depo. (Doc. 18 Exh. 1) Exh. 14. at 2. Former Police Captain Ben King ("King"), also an African-American male, was Minnifield's commanding officer. King Depo. (Doc. 18 Exh. 1) 9–10.

On January 19, 2007, while plaintiff was assigned to a unit known as "HICOPP," he was in a fatal shooting accident. Minnifield Depo. 12, 38. During the same occurrence, plaintiff also suffered a broken thumb. *Id.* He was referred by the city for an assessment and treatment to Dr.

[1]The parties have consented to an exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). *See* Doc. 12.

Cuicevich, a City doctor.[2] Minnifield Depo. 133, Exh. 16. In addition to his thumb injury, plaintiff was diagnosed with a Post-Traumatic Stress Disorder ("PTSD"). King Depo. Exh. 3. He did not return to work until July 18, 2007. Minnifield Depo. 12, 14, Exh. 14.

Plaintiff made a claim with the City for Injury with Pay leave ("IWP")[3] as a result of the incident. The City approved his IWP request as it pertained to his physical injury and denied his request to the extent it was based on his PTSD. Minnifield Depo. 14–17; King Depo. Exh. 1. The City also did not pay for medical treatment related to the PTSD. Minnifield Depo. 14–17. Plaintiff was required to pay for treatment himself. *Id.* at 13, 19. In denying his PTSD claim, the City stated that plaintiff's PTSD was not related to his thumb injury. King Depo. Exh.1; Minnifield Depo. Exh. 13 at 2. Plaintiff exhausted all available sick and vacation time after the IWP period ended. Minnifield Depo. 18. He was not paid for several months. *Id.* According to plaintiff, during the period of unpaid absence, he was threatened with discontinuation of water and electricity service and had difficulty washing laundry. *Id.* at 33–34.

Plaintiff later appealed the denial of leave and medical benefits to the Jefferson County Personnel Board ("Board"). Minnifield Depo. Exh. 15. On October 14, 2008, after a hearing, the Board reversed the City's denial and restored plaintiff's leave and benefits. Minnifield Depo. 78–79; Jefferson County Personnel Board Case IWP-2008-1686 (Minnifield Depo. Exh. 13). Plaintiff was awarded the full amount of IWP leave he had requested. Minnifield Depo. 79–80.

Dr. Ciucevich recommended that plaintiff be given a change of environment and duties

---

[2]Plaintiff was also treated by Doctors Lance and Walker.

[3]IWP is a benefit given to city employees for job-related injuries which cause a disability requiring absence from work for up to 180 days. Minnifield Depo. 12.

upon return to the work force. King Depo. Exh. 3. Specifically, Dr. Ciucevich recommended that plaintiff not be reassigned to patrol duty and that he be kept away from dangerous and confrontational situations. *Id.* On March 18, 2007, plaintiff requested limited or special duty status. Minnifield Depo. Exh. 2. He again requested limited duty on July 2, 2007. King Depo. Exh. 2. Plaintiff was instructed to see a psychiatrist, King Depo. Exh. 6; he did so on July 13, 2007, King Depo. Exh. 7. The psychiatrist, Dr. John Langlow, found that plaintiff was fit for full duty if not assigned to patrol duty. *Id.* King, however, would not allow plaintiff to return to full duty with these restrictions. King Depo. Exh. 12.

When plaintiff returned to work, he was wearing a linen, trimmed shirt that he contends was cut to be worn outside of the pants. Minnifield Depo. 32. The "Plain Clothes Regulations for Officer/Civilian Employees" require that, "Apparel should be conservative and in good taste for a business environment. Clothing should be of appropriate length and fit to facilitate proper movements and to portray a professional image." Minnifield Depo. Exh. 3. Captain King told one of the lieutenants to tell plaintiff to tuck in his shirt. Minnifield Depo. 31–33. The next day, plaintiff was wearing jeans. *Id.* at 32–33. According to policy, officers on limited or special duty status are not to wear jeans. Minnifield Depo. Exh. 4. Plaintiff was made to return home to change. Minnifield Depo. 33–34. He argues that King allowed other special duty officers to wear jeans. *Id.* Upon return to the precinct that day, plaintiff requested permission to speak to Captain King but permission was apparently refused. *Id.* at 35. Sergeant Joe Roberts reportedly said that "Y'all already have problems and I'm not going to allow you to do it." *Id.* at 35.

Shortly thereafter, Sergeant Sellers told plaintiff that "based on [his] seniority," his off

days were going to be changing to Thursdays and Fridays.[4] *Id.* at 45–46. Plaintiff states this affected him because his schedule had been set up in a way that allowed him to be with his family. *Id.* at 47. Plaintiff was told that Captain King was going to shut down a slot for Saturday and Sunday. Plaintiff pointed out that Officer Noah Hall, who was below plaintiff seniority-wise, retained Fridays and Saturdays off, and Sellers told plaintiff he would check into it. *Id.* at 49–53. Sergeant Roberts later told plaintiff that "seniority don't mean nothing." *Id.* at 54.

The Rules and Regulations state that officers will have their choice of shift assignments "by seniority, so long as the interest of the Department is kept foremost." Minnifield Depo. Exh. 5. Defendant states that plaintiff's days were changed to Thursday and Friday because "this was most optimal for the department." Minnifield Depo. Exh. 7. King sent a memo to Lieutenant Foster stating:

> As I have previous stated to you do not open another Friday and Saturday off day slot. If you want to change an officer who currently off days are Friday and Saturday and has less seniority for Officer Minnifield, that is your decision to make. Other options, you can assign Officer Minnifield to HICOPP (SouthTown Housing Community) with Saturday and Sunday off or let him maintain his current off days (Thru & Fri) until the new officers complete their field training in October 2007.

Minnifield Depo. Exh. 9. However, plaintiff reportedly did not want to return to HICOPP. Minnifield Depo. Exh. 10. Plaintiff states he did not return to HICOPP because the duty was not consistent with doctors orders. Minnifield Depo. 134–35. Thus he retained the days off of remained Thursday and Friday. Minnifield Depo. Exh. 10.

On August 2, 2007, plaintiff made a hostile work environment claim to Deputy Chief Lucette McMillan ("McMillan"). King Depo. Exh. 14. On August 6, 2007, King reportedly

---

[4]Before plaintiff was injured, he worked five days a week in HICOPP and had Saturdays and Sundays off of work. *Id.* at 38–39, 45.

received a letter from plaintiff's doctor clearing him for full duty. Minnifield Depo. Exh. 7. Plaintiff was returned to full duty status, although he states that the recommendation from his medical professionals remained the same and that he should have had a change in environment. Minnifield Depo. 66. On August 8, 2007, plaintiff again reported to McMillan alleging that he was being discriminated against on the basis of his race; plaintiff also filed an internal hostile environment complaint against Captain King and the chain of command below King. Minnifield Depo. 67, Exh. 12. Plaintiff was told that McMillian would not investigate the claim but would turn it over to internal affairs.[5] Minnifield Depo. 71.

On August 18, 2007, plaintiff was written up and informed he was being investigated for failing to show up for work on one of his days off and charging him as AWOL (Absent Without Leave) on August 4, 2007. *Id.* at 139; King Depo. Exhs. 15, 17, 23. Plaintiff was further told that a hearing would be held on the matter on August 20. Minnifield Depo. 139. At the hearing Lieutenant Foster stated that he had told plaintiff he would get back to him about changing his days off and had not yet done so. King Depo. Exh. 26. King determined there was a miscommunication and plaintiff was not disciplined for the alleged AWOL. King Depo. Exhs. 25, 26. Later that day, plaintiff received a letter informing him he was being transferred to the East precinct.[6] Minnifield Depo. Exh. 11. Defendant's state that plaintiff was being transferred

---

[5]Plaintiff argues that when he had previously complained of racial discrimination to Internal Affairs, he had been told that "IAD is not here to investigate a complaint an officer makes on a commander . . . ." Minnifield Depo. 68–70. Plaintiff states that this particular matter was not investigated by Internal Affairs for almost a year, when plaintiff when to Police Chief A.C. Roper. *Id.* at 72–73. A week after his meeting with Roper, Internal Affairs stated that it was unable to sustain the plaintiff's complaints. *Id.* at 77.

[6]Plaintiff has not provided evidence, beyond his deposition testimony, of the incidents he alleges occurred at the East precinct.

away while his hostile work environment claim against King was investigated. King Depo. 84–86.

Plaintiff began working at the East Precinct as a desk officer. Minnifield Depo. 143. Shortly after beginning work there, plaintiff became sick with salmonella. *Id.* at 144. After plaintiff requested sick leave and provided a doctor's note, Sergeant White ("White") called plaintiff at home and said "[W]hat's wrong with you? It don't look like nothing is wrong with you to me." *Id.* at 145. Plaintiff reiterated that he had provided medical documentation, White replied, "Well, I'm going to ask you anyway again, and you are going to tell me. What's wrong with you?" *Id.* at 145–46.

When plaintiff returned to work the following Monday, he was called into the office and told that he was no longer going to be on desk duty. *Id.* at 146. White told plaintiff that while he at been out sick, White had been recruiting other officers, including officer J.D. Strickland, to take over plaintiff's position at the desk. *Id.* at 146–47. White explained that the precinct was going to use utility people to work the desk on a rotating basis. *Id.* at 147. Plaintiff decided to speak with Captain Crane ("Crane") about the matter and explained to him that the doctor's orders not being followed. *Id.* at 148. Crane told plaintiff to submit to another evaluation from Dr. Cuicevich, and that he would be taken out of service until the evaluation was completed. *Id.* Plaintiff submitted to the additional evaluation which resulted in the same findings–that plaintiff was fit for full duty with the same change of environment. *Id.* at 149.

Subsequently, plaintiff argues that White attempted to discipline him for the way he wrote monthly reports. *Id.* at 150–51. Plaintiff also states that White would not allow him to make choices about use of vacation in lieu of casual leave. This decision was subsequently

overruled Lieutenant Michael Ashworth. *Id.* at 156.

In 2009, while at the East Precinct, plaintiff sustained a back injury and scheduled doctor's appointments for the injury. *Id.* at 96. Plaintiff later decided he wanted to try out for the department's elite tactical SWAT unit.[7] *Id.* at 96–97, 103. In order to attend the tactical tryouts and compete in the physical assessments,[8] plaintiff needed his doctor's clearance. *Id.* City employee Michelle Taylor cancelled these appointments; plaintiff claims the cancellations occurred after he complained to the City Council Safety Committee about preferential treatment given to white employees by the Occupational/Medical Services Unit. *Id.* at 99–106. During this period, Sergeant Mitchell apparently told plaintiff that the City had people following him to his appointments. *Id.* at 162–63. Plaintiff eventually was able to schedule an appointment with the City doctor at 2:30 pm on the day of the tryouts, although the tryouts began at 7:30 that morning. *Id.* at 107. According to plaintiff, the City was not going to give him an earlier appointment with the Medical Services Unit, which caused him to see his personal doctor for clearance to participate in the tryouts. *Id.* at 107. Plaintiff's personal doctor cleared him and plaintiff took part in the tryouts. *Id.* Later the same day, after the tryouts concluded but before plaintiff's shift began, he was also cleared by the City doctor. *Id.* at 107–08. Plaintiff claims he was subsequently investigated for "deceptive practices" and "presenting false documents" for obtaining the clearance from his personal doctor. *Id.* at 108.

---

[7]At plaintiff's interview before being placed on the tactical unit, he was questioned about filing complaints against his supervisors. Id. at 164. He was also told that in order to receive his SWAT patch, he had to complete an obstacle course assessment in a certain time. After doing so, the Plaintiff was required to complete the assessment again. There is no evidence that any other officer has ever been required to complete the course a second time. Id. at 167.

[8]The tryouts included running, an obstacle course, and shooting skills. *Id.* at 86.

Plaintiff states that he was the only candidate out of the thirteen who tried out that passed all three of the required tactical assessments, *id.* at 87, 89, yet he was not selected for the tactical team. Plaintiff argues that two employees who failed the shooting skills portion of the assessment were selected for the unit, including white employee Alex Thomas and black officer Merriman Bell. *Id.* at 90–92. Both men were selected for service on the motor scout unit but failed subsequent skills assessments for that part of the unit as well. Plaintiff argues that these officers were nonetheless allowed to remain on the tactical unit working on warrant detail. *Id.* at 93.

Plaintiff heard a rumor that he was ineligible because of his medical status and met with Deputy Chief Fisher to discuss his non-selection. *Id.* at 113. Plaintiff filed a grievance related to his non-selection on either September 12, 2009, or September 14, 2009. *Id.* at 115. Deputy Chief Fisher agreed that plaintiff had been cleared and was eligible. Plaintiff withdrew his grievance and was selected for the unit on October 23 or 24, 2009. Plaintiff was placed on the freeway unit and warrant detail, although he had stated a preference for the K-9 bomb dog unit, which paid more. *Id.* at 115–21.

Plaintiff also states that he was never considered for a "Combat Cross" while under Captain King in the South Precinct in spite of his qualifications for the honor. *Id.* at 74. Captain King was on the committee that makes the award but plaintiff alleges that King refused to place him in consideration for it. Plaintiff eventually received the honor after being moved to the East Precinct. *Id.* at 74–75.

Plaintiff observed that Birmingham Police Officer Robert Kerzic ("Kerzic"), a while male, was involved in a shooting incident in which he was shot; as a result of the incident, Kerzic

was diagnosed with PTSD.[9] Minnifield Depo. 131; Carter Depo. 59–60. Kerzic was also under the command of Captain King and, like plaintiff, made a claim for IWP. Minnifield Depo. 132; Carter Depo. 50. Kerzic was sent to the same clinic for treatment and was seen by the same doctor. Minnifield Depo. 133, Exh. 16; Carter Depo. 27. The City approved the leave and benefits related to Kerzic's PTSD and paid his medical bills. Minnifield Depo. 133; Carter Depo. 50, 56, 59–61. Plaintiff contends that these benefits were granted even though Kerzic did not comply with the City's direction to be evaluated by another doctor, Carter Depo. 51–52, 62; plaintiff claims that he never failed to comply with the City's directions regarding his own treatment.

Plaintiff filed a charge of race discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") on November 14, 2007. Minnifield Depo. Exh. 14. He filed an amended Charge on December 5, 2008. Minnifield Depo. Exh. 16. He was issued a right to sue letter on March 20, 2009. Minnifield Depo. Exh. 17. On June 18, 2009, plaintiff filed this lawsuit alleging that he was discriminated against on the basis of his race and in retaliation for complaints of discrimination, and subjected to a hostile working environment, in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq.*; and 42 U.S.C. §§ 1981; and 42 U.S.C. § 1983. *See* Compl.

**Standard of Review**

A moving party is entitled to summary judgment if there is no genuine dispute as to any material fact, leaving final judgment to be decided as a matter of law. *See* FED. R. CIV. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The facts, and any

---

[9] Kerzic was himself shot during the incident.

reasonable inference therefrom, are to be viewed in the light most favorable to the non-moving party, with any doubt resolved in the nonmovant's favor. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970). Once met by the moving party, however, the burden shifts to the nonmovant to come forward with evidence to establish each element essential to that party's case sufficient to sustain a jury verdict. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990).

**Legal Analysis**

**Qualified Immunity**

Defendant King asserts qualified immunity as a defense to all the federal claims made against him in his individual capacity. State or local actors are entitled to qualified immunity for actions taken pursuant to their discretionary authority unless the conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity gives protection to all but the plainly incompetent or those who knowingly violate the law. *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991). For a constitutional right to be clearly established, "its contours must be sufficiently clear that a reasonable official would understand what he is doing violates that right. . . . [I]n the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 122 S. Ct. 2508, 2515 (2002) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (internal citations omitted).

To receive qualified immunity, King must prove he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002); *Lee v. Ferraro*, 284 F.3d 118, 1194 (11th Cir. 2002). If he does, the burden shifts to plaintiff to prove that qualified immunity is not appropriate. *Vinyard*, 331 F.3d at 1346.

It is clear that King was acting within the scope of his discretionary authority during all events alleged in this litigation. King was plaintiff's supervisor, making command decisions for the operation of the precinct. He was on duty and performing the duty of a supervisor when each of the alleged incidents was said to have occurred. Plaintiff does not dispute that King was acting within his discretionary authority. Instead plaintiff argues that King violated a clearly established constitutional right. It is true that the constitutional right not to be discriminated against based on race is clearly established. However, as discussed below, plaintiff cannot show that King's conduct violated these established rights. King is entitled to qualified immunity based on these claims.[10]

**Racial Discrimination**

In the absence of direct evidence of discrimination, courts analyze Title VII and section 1981 claims under the *McDonnell-Douglas* burden-shifting analysis, which first requires plaintiff to create an inference of discrimination by establishing a prima facie case. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527–28 (11th Cir. 1997); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802

---

[10]Even if King is not entitled to qualified immunity, plaintiff fails to provide evidence supporting the substance of his claims.

(1973)); *Standard v. A.B.E.L. Serv., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (stating that Title VII and section 1981 claims have the same analytical framework). To establish a prima facie case of discrimination under Title VII, plaintiff must generally prove: (1) that he is a member of a protected class; (2) that he was qualified for his position; (3) that he suffered an adverse employment action; and (4) that he was treated less favorably than a similarly situated person outside of his protected class. *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 842–43 (11th Cir. 2000).

Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's termination. *Id.* The defendant must "clearly set[] forth, through the introduction of competent evidence, the reasons for plaintiff's discharge." *Conner v. Fort Gordon Bus. Co.*, 761 F.2d 1495, 1499 (11th Cir. 1985). This burden is "exceedingly light" and is "merely a burden of production and not a burden of proof." *Id.*

If the employer meets this burden of production, the plaintiff must then establish that the defendant's proffered reasons were pretext for illegal discrimination. *Id.* (citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981)). A plaintiff may demonstrate pretext by directly persuading the court that a discriminatory reason more likely motivated the employer, or by indirectly showing the employer's proffered reason is unworthy of credence. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000). This can be done by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder would find them unworthy of credence." *Combs*, 106 F.3d at 1538. A reason is not a pretext for

discrimination "unless it is shown both that the reason is false, and that discrimination was the real reason." *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 515 (1993)).

As an initial matter, it is well settled that a civil action is limited by the EEOC charge and the scope of the EEOC investigation relating to that charge. *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000). Plaintiff argues that King and the City discriminated against him by taking three actions: first, King did not grant plaintiff the twenty additional days of IWP that he requested; second, King changed plaintiff's off days from Saturday and Sunday to Thursday and Friday; and third, King required plaintiff to change or alter his clothing on two occasion while on light duty. Plaintiff also argues that White targeted him with respect to his work assignments and required him to work patrol.

Plaintiff can prove that he was a member of a protected class–that of African-Americans–and can likely prove that he was qualified for his position. However, as discussed below, he cannot show that he suffered an adverse employment action, that defendants treated similarly-situated non-black employees differently, or that any actions taken by the City or King were pretext for discrimination.[11]

For several of the described incidents, plaintiff cannot establish that he suffered an adverse employment action. To establish an adverse employment action, an employee must show conduct which "alters the employee's compensation, terms, conditions, or privileges or

---

[11]That does not mean that Officer Minnifield was treated fairly, only that he was not the victim of unlawful discrimination. The court may remedy only discriminatory conduct, not a supervisor's pettiness. *See McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986) ("[Title VII] is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of . . . discrimination and is not proscribed by Title VII.") (citations omitted).

employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). Plaintiff appealed the City's denial of IWP to the Personnel Board, which reversed the City's decision and granted plaintiff twenty additional days of IWP. The City complied with the Personnel Board's order, so plaintiff lost no pay. Similarly, White's denial of plaintiff's vacation time was overturned. Minnifield Depo. 156. Being ordered to change clothes is not an adverse employment action, nor is an order to submit to a medical evaluation for clearance after an injury. Furthermore, throughout his employment, plaintiff continued to receive pay increases, did not lose pay, and was never demoted. Minnifield Depo. 173.

Plaintiff also has not identified competent evidence to support the claim that he was treated differently than similarly situated non-black persons. In order to be considered similarly situated, the position and conduct of the persons to whom he compares herself must be "nearly identical" to his. *Dawson v. Henry County Police Dep't*, 238 Fed.Appx. 545, 548 (11th Cir. 2007). He has not identified an employee with comparable health problems to those he experienced who was treated differently. Plaintiff points to Kerzic as a white officer who was treated for PTSD after a fatal shooting. Although both plaintiff and Kerzic fatally shot a suspect in the line of duty, plaintiff sustained a broken finger and Kerzic was himself shot. The City approved PTSD treatment for Kerzic because of his physical injury, not because he shot someone to death. The City denied treatment to plaintiff because his physical injury was merely an injury to his thumb. The City's denial of benefits was linked to the relation between the injury and the alleged PTSD. Kerzic is not considered "nearly identical" for the purposes of finding a Title VII

comparator.[12]

Defendants have provided legitimate non-discriminatory reasons for each action allegedly taken. Plaintiff's requested for IWP leave due to his PTSD was evaluated and denied with explanatory reasons.[13] Plaintiff's days off were changed on ground of departmental needs–in compliance with the regulations–and were not changed back because plaintiff did not want to return to HICOPP. Plaintiff wore jeans and a shirt that was not tucked in; defendant believed this was inappropriate attire and told plaintiff to go change. Because plaintiff's dress that day violated the clothing regulations, defendants' request for him to change his clothing is reasonable. These reasons satisfy defendants' burden.

Even if plaintiff could establish a prima facie case of race discrimination, there is no evidence that the City's legitimate non-discriminatory reason for its actions are a pretext for race discrimination. The City has properly produced a legitimate non-discriminatory reason for each of its actions. Plaintiff has not directed the court to evidence linking the alleged actions to his race. As discussed above he has not pointed to evidence suggesting that other similarly situated non-black employees were treated differently, nor has he pointed to statements or documents showing racial or gender-based discriminatory animus on the part of any of his supervisors. There is simply no evidence of racial discrimination on the part of either King or the City.

---

[12]Plaintiff does not point to any alleged comparator for the other incidents alleged under this claim. Plaintiff even admits that other employees also had difficulty working with King. Minnifield Depo. 175.

[13] As to Captain King's liability, he did not have the authority to deny or grant plaintiff's IWP. Instead it was Police Chief Annette Nunn who followed the Personnel Department's recommendation to deny plaintiff's IWP. King Depo. 27–28.

**Hostile Work Environment**

To the extent that plaintiff contends that he was subjected to a hostile working environment, his claim fails. In order to establish a hostile working environment, plaintiff must show:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under a theory of vicarious or of direct liability.

*Reeves v. DSI Sec. Servs., Inc.*, 395 Fed. Appx. 544, 545–46 (11th Cir. 2010) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). To establish the "severe or pervasive" element, "a plaintiff must show not only that he subjectively perceived the working environment to be abusive but also that a reasonable person would view the environment as hostile and abusive." *Id.* (citing *Miller*, 277 F.3d at 1276).

In evaluating whether the harassment was objectively severe, courts look at the totality of the circumstances and consider, "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* The conduct is considered cumulatively and statement or conduct that are unrelated to the defendant's race are not considered. *Id.* (citing *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010); *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1301–02 (11th Cir. 2007)).

Even assuming all conduct complained of is true, plaintiff has failed to show that he was

subjected to a working environment that a reasonable person would find to be hostile and abusive. Plaintiff has failed to provide evidence that any of the alleged harassment affected his ability to perform his job. Similarly none of the incidents were physically threatening or humiliating. Moreover, he has not identified evidence that any action was racially motivated. While plaintiff and King may not have gotten along, plaintiff has failed to prove that any conduct by King or others arose to that which would create an objectively hostile working environment. *See Edmond v. Univ. of Miami*, 2011 WL 4495638 (11th Cir. 2011) (holding that plaintiff failed to show he endured a hostile work environment when he complained of coworkers telling him he had a foreign accent, yelling at him in the presence of others, assigning him to patients who had animosity against his national origin, and calling a coworker to interpret for him in the presence of others); *Reeves*, 395 Fed. Appx. at 546 (holding that assigning overtime to white employees, making implied racial epithets, leaving plaintiff "hanging on the telephone" when he became ill at work, and reprimanding him after he hit a parked car did not constitute a hostile work environment).[14]

**Retaliation**

Courts analyze retaliation claims under Title VII with the same burden-shifting analysis as is used for other Title VII claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).To establish a prima facie case of retaliation under Title VII, plaintiff must prove: "first, the plaintiff engaged in statutorily protected conduct; second, the plaintiff suffered an adverse

---

[14] *See also Gupta v. Fla. Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000) (holding that conduct was not sufficient to constitute a sexually hostile work environment); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247 (11th Cir. 1999) (same).

employment action; and finally, the adverse action was causally related to the protected expression." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999). Plaintiff must have had a reasonable, good-faith belief that discrimination existed. *Meeks v. Computer Assocs. Int'l.*, 15 F.3d 1013, 1021 (11th Cir. 1994). The allegations and record must indicate that this belief, though perhaps mistaken, was objectively reasonable. *Harris v. Blockbuster Entertainment Corp.*, 139 F.3d 1385 (11th Cir. 1998).

To establish an adverse employment action, an employee must show conduct which "alters the employee's compensation, terms, conditions, or privileges or employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

Plaintiff engaged in two potential protected activities: he complained of a racially hostile work environment in August 2007, and he filed an EEOC Charge in November 2007. As to the August complaint, even assuming plaintiff's belief that he was being subjected to a racially hostile work environment was objectively reasonable, his retaliation claim fails as to both King and the City since the alleged retaliation is not sufficiently adverse. After plaintiff's August complaint of discrimination, he was written up for being AWOL–which was later dismissed–and was transferred to the East Precinct. Neither of these complaints were objectively serious enough to alter plaintiff's "compensation, terms, conditions, or privileges of employment." *See Gupta*, 212 F.3d at 587 (holding that alleged retaliation was not sufficiently adverse when plaintiff was, among other things, denied a pay raise despite an above satisfactory evaluation by her supervisor, denied an extension on her tenure clock, placed on the search committee for another position

which prevented her from applying for that position, assigned to teach more credit hours while not assigned to teach a desired class, and had her visa application intentionally delayed); *Bell v. Eufaula City Bd. of Educ.*, 995 F. Supp. 1377, 1385–86 (M.D. Ala. 1998) (transferring teacher from eighth grade class to seventh grade class was not an adverse employment action, even though it required the teacher to review new books, create new lesson plans, engage in new preparation, and leave a subject she loved); *Merriweather v. Ala. Dept. of Public Safety*, 17 F. Supp. 2d 1260, 1276 (M.D. Ala. 1998) (transfer of state trooper from one city to another city did not constitute an adverse employment action, even though it caused the trooper to experience a longer commute to work, emotional problems, and great embarrassment for being transferred without a promotion).

Even assuming that plaintiff could demonstrate a prima facie case as to the EEOC Charge, plaintiff's claim for retaliation fails. As to King, since plaintiff had been transferred to the East Precinct (and away from King) prior to his filing of the EEOC Charge, King was not involved in any later alleged retaliatory actions. As to the City, plaintiff has not provided evidence that any of the alleged actions were pretext for retaliation. Plaintiff has not pointed to any evidence linking the alleged actions to his filing of the EEOC Charge. He has not pointed to statements or documents showing discriminatory animus on the part of any of his supervisors. All actions taken appear to have been taken based on plaintiff's medical status and whether or not he had been cleared for full duty with no restrictions. While there appear to have been some miscommunications between various officers regarding plaintiff's clearance for duty, there is no evidence that any actions are related to plaintiff's complaining of discrimination. As discussed

above, plaintiff continued to receive merit-based pay raises and was never demoted. There is simply no evidence of retaliatory discrimination on the part of either King or the City.

**Conclusion**

Plaintiff has failed to establish a genuine dispute of fact sufficient to allow his claims from proceeding to trial. Defendant's motion for summary judgment (doc. 17) is due to be GRANTED and this case DISMISSED. A separate order will be entered.

DONE and ORDERED this the 7th day of December, 2011.

PAUL W. GREENE
CHIEF MAGISTRATE JUDGE